*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

JAMES MANFORD JARRELL,

Defendant-Appellant.

FOR PUBLICATION
December 1, 2022
9:30 a.m.

No. 356070
Crawford Circuit Court
LC No. 20-004605-FC

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and GARRETT, JJ.

GARRETT, J.

Defendant James Jarrell was convicted at a bench trial of one count of unlawful imprisonment, MCL 750.349b, and two counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(c). Jarrell argues that the trial court erroneously interpreted the restraint element of unlawful imprisonment to punish the use of psychological power. He also contends that lifetime sex offender registration under the Sex Offenders Registration Act (SORA), MCL 28.721 *et seq.*—a consequence of his CSC-I conviction—constitutes cruel or unusual punishment. We hold that the restraint element can be satisfied by evidence of nonphysical force that involves a credible threat of harm, and that sufficient evidence of restraint supported Jarrell's unlawful imprisonment conviction. We also conclude that, as applied to Jarrell's case, SORA's mandatory lifetime registration requirement is neither cruel nor unusual. We therefore affirm Jarrell's convictions and sentences.

## I. FACTUAL BACKGROUND

This case presents a graphic series of events involving Jarrell's sexual and psychological exploitation of the victim that resulted in his CSC-I and unlawful imprisonment convictions.

In January 2020, the victim worked as an independent escort. She struggled with substance abuse and had recently relapsed after eight months of sobriety. While hanging out with two men, including a drug dealer, she took what she thought was her pack of cigarettes, but she soon realized that the pack belonged to the dealer and contained crack cocaine worth "thousands" of dollars. She and the other man used the cocaine at a hotel room. She knew that the dealer was not the type of person you "mess with," so she began trying to repay him by escorting. She eventually called

-1-

her friend "B," a drug "kingpin," for help. She also owed B a couple of hundred dollars, but she testified that B knew she would pay it back.

The victim was staying with B and three or four other women at a house in Ypsilanti when Jarrell came into the picture. One night, the victim wanted to leave the house so she could go to a quieter apartment complex where her friends lived to get some sleep. B arranged for a ride for her with Jarrell. Jarrell had traveled from Roscommon to Ypsilanti that night with Brandon Zelmanski and Billy Joe Crunk.[1] The group arrived at the house where the victim was staying, and she got into the backseat of the car next to Jarrell. She was using her phone to give directions when Jarrell asked her if she wanted to come up north with them to sleep, detox, and do fun activities like snowmobiling and ice fishing. She was hesitant, but Jarrell persuaded her to go. She and Jarrell did not discuss how long they would be up north. In hindsight, she felt that Jarrell lied to her to persuade her to go. Over the course of the next few days, the victim came to believe that B paid off her crack cocaine debt to the drug dealer and then, essentially, set her up to be taken by Jarrell to pay back her debt to B. The victim testified that she later realized that B was not involved.

At some point near the beginning of the drive, Jarrell pulled a three-inch pocketknife from his pocket and told her that everyone should carry a pocketknife. The victim was frightened by the random act. During the drive, she told Jarrell that she was no longer sure she should go up north, but Jarrell reassured her that it would be fun, so she agreed to continue the trip. The victim testified that Jarrell would not stop touching her and that they eventually became sexually intimate in the backseat. The victim participated because she was "scared for [her] life" and felt "trapped in a situation that [she] couldn't get out of . . . just being in the car going up north." The victim and Jarrell had oral and vaginal sex throughout the drive. The trial court found that despite the "coercive nature" of the car ride, any sexual activity in the car was consensual.

According to the victim, the group stopped at a rest area in West Branch at her request. Jarrell followed her into the restroom, and at one point, entered her stall. She tried to use some of the heroin she had to calm her anxiety and hoped that she would find someone in the restroom to ask for help, to no avail. She returned to the car and the group soon arrived in Roscommon. The victim and Jarrell went to the home of Jeff Kobel, where Jarrell was residing in a front porch bedroom that he rented from Kobel.

Kobel's cluttered home had exposed electrical wires in the ceiling in several locations and was full of weapons. Kobel testified that there was a BB gun in his bedroom and that he had a knife collection of at least 50 knives spread throughout the home, including in a closet near the front door, in the living room, and holding up the curtains in his bedroom. The victim testified that there were pocketknives in every room, as well as different types of knives—like machetes and long knives—everywhere. She also testified that Jarrell always carried a pocketknife.

According to the victim, shortly after arriving at Kobel's home, she and Jarrell continued to have sex at Jarrell's initiation in his porch bedroom. Thereafter, a tall, red-haired man came to Kobel's home; Jarrell told her to do whatever the man said and to please him. At some points, Jarrell and the red-haired man had sex with her at the same time, and the sex went on for hours.

---

[1] Witnesses offered differing recollections of the date that the group drove to Ypsilanti.

She did not ask for the sexual activity to stop because she was afraid—"there [were] weapons in the house and [she] just did whatever [Jarrell] . . . told [her] to do." The victim testified that she felt coerced into these sexual encounters for a number of reasons, including that Jarrell made her believe she owed him a debt.

Jarrell gave the victim methamphetamine, which she did not have experience with, and she used the methamphetamine every day while at Kobel's home. The victim testified that she was rarely left alone in Kobel's home. Kobel recalled the victim being left alone inside the home a single time, but Kobel was right outside. The victim believed she was always being watched, testifying that Jarrell told her as much and that Jarrell would point to the ceiling to warn her that there were cameras and that she would go "viral." The exposed wires in the ceiling led the victim to believe that the home had multiple surveillance cameras. She was always scared and felt like she could not leave.

Although the victim testified that she was never physically restrained, weapons were always present and Jarrell said things that made her fearful. For example, the victim testified that Jarrell told her that he was a terrorist who had killed people in the past and gotten away with it. Jarrell read her mother's address verbatim from her identification card, which he obtained on his own from her purse, and he threatened her daughter by saying that "it would be a shame if something happened to [her]." Jarrell also told her that if she ran there was "nothing but snow and woods," and that the police would not help her because he had them "in his pocket." The victim testified that Jarrell's threats became worse over time, that she believed what Jarrell told her, and that Jarrell "instilled fear" in her.

Corroborating some of the victim's testimony, Janie Hicks, Zelmanski's fiancée, testified that one time, the victim asked Hicks to call the police if she needed help because she believed that Jarrell and others would kill her. Hicks also recounted that the victim told her that there were hidden cameras in Kobel's home watching and listening to everyone. Hicks did not believe the victim was in danger, so she did not call 911. But Hicks told Zelmanski, and they decided to go to Kobel's home to tell Kobel and Jarrell about the victim's allegations. Zelmanski testified that the victim blocked the doorway to Jarrell's bedroom so that he could not talk to Jarrell, but the victim stated that Zelmanski did share the allegations with Jarrell.[2] The victim testified that afterward, Jarrell threatened her with a long metal antenna and with a large, hot fire poker that had been used to stir the fire.

Later that night, the victim seized an opportunity to leave and ran. She began banging on doors to multiple neighbors' homes across the street, but no one answered. She found a car with keys in it and drove off before the car ran out of gas near Jason Amaral's yard. Amaral testified that the victim knocked on his door, and was incoherent and rambling about having been kidnapped. The victim initially wanted him to call the police, but then asked him not to because the kidnappers were friends with the police and they would not help her. He described the victim as shaken and panicky. Amaral eventually called the police, who interviewed the victim and took her into custody for theft of the truck. The victim also underwent an examination by a sexual

---

[2] Zelmanski testified that after the victim left, Zelmanski told Jarrell that the victim thought Jarrell and others planned to kill her; Jarrell's response was "really," and "they all say that."

assault nurse examiner. The nurse testified that the victim had injuries that could be consistent with sexual assault. The nurse also recounted that the victim expressed fear during the examination, stating that Jarrell held her hostage, that several men had sex with her "over and over again," and that Jarrell threatened to kill her family if she came forward against him.

The trial court made detailed findings of fact and conclusions of law on the record. The court found proof beyond a reasonable doubt that Jarrell unlawfully imprisoned the victim, in that he restrained her by means of a weapon and to facilitate the commission of nonconsensual sexual activity. The court similarly found proof beyond a reasonable doubt that Jarrell engaged in nonconsensual vaginal and oral sex with the victim, and that this sexual activity occurred during the commission of unlawful imprisonment. The court therefore found Jarrell guilty of unlawful imprisonment and two counts of CSC-I. At sentencing, the trial court imposed lengthy terms of imprisonment and advised Jarrell that he had to register as a sex offender under SORA. Jarrell now appeals his convictions and sentences as of right.

## II. UNLAWFUL IMPRISONMENT

Jarrell contends that the trial court erred by finding that the restraint element of unlawful imprisonment was satisfied by evidence of Jarrell imposing "psychological power" over the victim. In Jarrell's view, unlawful imprisonment requires evidence of physical force.

## A. PRESERVATION AND STANDARD OF REVIEW

The trial court concluded that evidence of psychological threats satisfied the knowing restraint element of unlawful imprisonment. Defense counsel was not required to object in order to preserve an appellate challenge to this decision. See MCR 2.517(A)(7) (in actions tried without a jury, no exception need be taken to a finding or decision). Resolution of this issue requires interpretation and application of the unlawful imprisonment statute, MCL 750.349b. Issues involving statutory interpretation are reviewed de novo. *People v Lydic*, 335 Mich App 486, 490; 967 NW2d 847 (2021). Likewise, the trial court's determination that a defendant's conduct falls within the scope of a penal statute is reviewed de novo. *People v Korkigian*, 334 Mich App 481, 489; 965 NW2d 222 (2020). De novo review means that "we review the issues independently, with no required deference to the trial court." *People v Beck*, 504 Mich 605, 618; 939 NW2d 213 (2019). Following a bench trial, we review a trial court's findings of fact for clear error and a trial court's conclusions of law de novo. *People v Pennington*, 323 Mich App 452, 464 n 7; 917 NW2d 720 (2018). "A finding is clearly erroneous if this Court is left with a definite and firm conviction that the trial court made a mistake." *People v Kimble*, 252 Mich App 269, 272; 651 NW2d 798 (2002).

## B. ANALYSIS

Jarrell contends that the trial court erroneously interpreted MCL 750.349b, the statute setting forth the elements of unlawful imprisonment.

When interpreting a statute, our primary goal is to carry out the intent of the Legislature by looking to the plain language of the statute. *People v Morrison*, 328 Mich App 647, 651; 939 NW2d 728 (2019). "If the statutory language is unambiguous, the court must apply the language

as written, and further analysis is neither required nor permitted." *Id*. Principles of statutory construction counsel us to give effect to every word, phrase, and clause, and avoid an interpretation that would render any part of the statute surplusage or nugatory. *People v Rea*, 500 Mich 422, 427-428; 902 NW2d 362 (2017). "When a word or phrase is not defined by the statute in question, it is appropriate to consult dictionary definitions to determine the plain and ordinary meaning of the word or phrase." *Id*. at 428.

MCL 750.349b provides:

(1) A person commits the crime of unlawful imprisonment if he or she knowingly restrains another person under any of the following circumstances:

(a) The person is restrained by means of a weapon or dangerous instrument.

\* \* \*

(c) The person was restrained to facilitate the commission of another felony or to facilitate flight after commission of another felony.

The statute defines "restrain" as "to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). Further, "[t]he restraint does not have to exist for any particular length of time and may be related or incidental to the commission of other criminal acts." *Id*.

At the end of the bench trial, the trial court found proof beyond a reasonable doubt that Jarrell knowingly restrained the victim. The court explained:

He did so by forcibly restricting her movements and forcibly confining her. *And that force is not in the traditional sense of force as [has] been argued by the defense that [the victim] was held down, was physically punched, was hit, was tied up, was chained or anything like that. It has to do with psychological power. It's manipulation.* It's convincing [the victim] that she was not free of being examined, of being watched, she was a YouTube star, suggested to her that there was camera [sic] watching her. Her own feelings validated that belief because every time she tried to grab a knife, on the two occasions she did before she finally left, she thought she was being watched because the defendant came to take the knife out of her hands immediately. It's notable, again, the restraint doesn't have to exist for any particular length of time and it can be related or incidental to the commission of other criminal acts. Here, I think that it happened the entire time that [the victim] was there. She was constantly being reminded of a debt. She was constantly being told that the debt is coming due. She was constantly being told that she's being watched and she was being told that she couldn't leave and if she did leave the police were in her (sic) pocket. All of those items of testimony, again, I find credible from [the victim] herself, and I find that because defendant said things and did things to make her feel those things, by reminding her that there's cameras, by telling her that she can't leave or if she does everybody [is] in her—his pocket,

defendant forcibly restricted by coercing her to believe that if she did leave she would be in trouble. [Emphasis added.]

The court also found proof beyond a reasonable doubt that the knowing restraint occurred by means of a weapon and to facilitate the commission of another felony—that being nonconsensual sexual activity. The court explained:

Clearly, I believe that there's proof beyond a reasonable doubt that [the victim] was restrained by means of a weapon. She was shown a weapon early on in the time period. She was told about a debt and the existence of it. There were weapons all over the house. She had a poker that was held up to her face in a threatening manner. She was threatened with a[n] antenna and told that she was going to be harmed with it. *The restraint, again, is more along the lines of a psychological threat. I will tell you that I am not aware of case law that specifically says forcibly restrict has to be by physical violence. I'm of the view that a forcible restriction, based upon psychological manipulation over a long period of time, is enough, and I find that in this case. She was restrained by means of the weapon, the display, the constant presence of weapons, and her view of what those weapons meant. She was restrained also to facilitate the commission of other felonies, and that was unconsensual* [sic] *sexual activity.* I don't find, despite my finding of consensual sex in the car ride, at some point it's clear to me that [the victim]'s view of the situation changed. She believed that she was in trouble and she believed that she made a mistake that she couldn't undo. At that point, [the victim]'s testimony was believable that she did what she had to, and her testimony to the nurse examiner was—again, the nurse examiner's testimony of what [the victim] said was again compelling testimony to the Court. [The victim] described to the nurse examiner that she knew better than to resist. She knew better than to not take the drugs that were being offered to her. She knew better because she had been threatened with debts, she had been threatened with weapons, she had been insinuated to be crazy, told that she was being watched, and had actions that confirmed that she was being watched. The restraint was clear. The restraint was clearly to the Court by proof beyond a reasonable doubt to facilitate the commission of other felonies. And those other felonies were two counts of criminal sexual conduct in the first degree. [Emphasis added.]

Therefore, as relevant to Jarrell's argument, to prove restraint, the facts must show beyond a reasonable doubt that the defendant (1) forcibly restricted a person's movement or (2) forcibly confined a person to interfere with that person's liberty. Both methods of restraint require proof of some quantum of force—i.e., *forcibly* restrict or *forcibly* confine. Because the term "forcibly" is not defined in MCL 750.349b, we may consult a dictionary definition to help determine the plain and ordinary meaning of the word. See *Rea*, 500 Mich at 428. The term "forcible," and the related term "forcibly," are defined as "[e]ffected by force used against opposition or resistance." *Black's Law Dictionary* (11th ed); see also *Merriam-Webster's Collegiate Dictionary* (11th ed). And "force" is defined as "[p]ower, violence, or pressure directed against a person or thing." *Black's Law Dictionary* (11th ed). Thus, for purposes of unlawful imprisonment, sufficient "force" can constitute any use of power, violence, or pressure exerted upon a person to restrict that person's movements or to confine that person in a manner that interferes with the person's liberty. While

-6-

physical force can be, and often is, used to confine someone against their will, there is no binding authority holding that physical force is required to satisfy the restraint element of unlawful imprisonment.[3]

Jarrell's interpretation of the unlawful imprisonment statute reads in a "physical force" requirement that is unsupported by the plain language. Had the Legislature intended the restraint element to require *physical* force or restraint, it could have used that language. Instead, it defined "restrain" more broadly: "to forcibly restrict a person's movements or to forcibly confine the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). Jarrell also points to the statute's silence on "psychological" force to conclude that force must be "physical." But the statute is similarly silent about "physical" force. We therefore do not agree that restraint should be interpreted to only include physical force without any indication from the plain language that the Legislature intended that result.

Jarrell cites MCL 750.520b, the CSC-I statute, as an example of a criminal provision that distinguishes between physical force and other types of coercion. The implication of this argument is that because the unlawful imprisonment statute fails to distinguish between physical and nonphysical coercion, the unlawful imprisonment statute necessarily does not punish nonphysical force. But Jarrell's reference to the CSC-I statute is unavailing. By expressly describing "force or coercion" for CSC-I as the "actual application of physical force or physical violence," see MCL 750.520b(1)(f)(*i*), the Legislature demonstrated that it can distinguish between physical force and force more broadly when it chooses to do so. In sum, we find that Jarrell's statutory interpretation arguments lack merit, and we agree with the trial court's conclusion that the term "restrain" does not *require* the use of physical force or violence.

To provide guidance for lower courts in future cases, we seek to clarify the type of evidence of nonphysical force that can establish the knowing restraint element of unlawful imprisonment. The phrase "psychological threat" or "psychological power"—while thoroughly explained by the trial court here—can be vague in isolation and difficult for trial courts to apply to unlawful imprisonment cases involving nonphysical force. We therefore hold that nonphysical force can constitute "restraint" under MCL 750.349b when the exerted force involves a credible threat of harm. This definition reflects the plain language of the statute, as credible threats of harm—even without physical violence to carry out those threats—can exert power or pressure that "forcibly restrict[s] a person's movements" or "forcibly confine[s] the person as to interfere with that person's liberty." See MCL 750.349b(3)(a). When a defendant exerts nonphysical force against a victim that involves a credible threat of harm,[4] and that threat "forcibly restrict[s] a person's

---

[3] Caselaw generally addresses whether there was sufficient evidence in a given case to support a conviction for unlawful imprisonment, without addressing whether the knowing restraint element requires physical force. See, e.g., *People v Kosik*, 303 Mich App 146, 150-154; 841 NW2d 906 (2013); *People v Railer*, 288 Mich App 213, 216-219; 792 NW2d 776 (2010).

[4] "Credible threat," for purposes of an aggravated stalking offense, is defined as "a threat to kill another individual or a threat to inflict physical injury upon another individual that is made in any manner or in any context that causes the individual hearing or receiving the threat to reasonably fear for his or her safety or the safety of another individual." MCL 750.411i(1)(b).

movements" or "forcibly confine[s] the person as to interfere with that person's liberty," a court may find that the victim has been restrained for purposes of MCL 750.349b.

At times, Jarrell's statutory interpretation argument blends into a sufficiency-of-the-evidence argument. Due process requires the prosecutor to introduce evidence sufficient for a trier of fact to find the defendant guilty beyond a reasonable doubt. *Jackson v Virginia*, 443 US 307, 318; 99 S Ct 2781; 61 L Ed 2d 560 (1979); *People v Hampton*, 407 Mich 354, 368; 285 NW2d 284 (1979). When reviewing a sufficiency of the evidence claim, the question is "whether, after viewing the evidence in a light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 US at 319. As a reviewing court, we "must defer to the fact-finder's role in determining the weight of the evidence and the credibility of the witnesses and must resolve conflicts in the evidence in favor of the prosecution." *People v Savage*, 327 Mich App 604, 614-615; 935 NW2d 69 (2019) (quotation marks and citation omitted).

Jarrell contends that the trial court's reliance on psychological manipulation was insufficient to sustain his unlawful imprisonment conviction. Of course, central to Jarrell's argument is the erroneous view that physical force is the only means of satisfying the element of restraint under MCL 750.349b. Properly interpreted, the facts as found by the trial court were sufficient to support the court's determination that Jarrell knowingly restrained the victim, and that the restraint occurred by means of a weapon and to facilitate the commission of CSC-I. The victim testified extensively about threats of harm Jarrell made that caused her to fear for her life. Among other evidence, the victim recounted how Jarrell hinted at violence against her and her family, displayed and possessed knives, and led her to believe that she owed him a debt, that cameras were watching her, and that Jarrell had the police "in his pocket." The trial court credited the victim's stated fears, finding that her belief in the truth of Jarrell's threats and claims was genuine. These credibility determinations—made by the trial court as fact-finder—are entitled to deference. See *Savage*, 327 Mich App at 614-615. Together, the evidence of credible threats of harm, along with other testimony about nonconsensual sexual activity, was sufficient to support the trial court's finding of proof beyond a reasonable doubt that Jarrell unlawful imprisoned the victim.

Jarrell alternatively contends that trial counsel was ineffective by failing to object to the trial court's legally unsound interpretation of restraint. Because this claim depends on the statutory interpretation argument that we have now rejected, counsel was not ineffective by failing to make a futile objection. See *People v Unger*, 278 Mich App 210, 256; 749 NW2d 272 (2008).

### III. CONSTITUTIONALITY OF SORA

Jarrell next raises a constitutional challenge to SORA, arguing that its lifetime registration requirement violates the 1963 Michigan Constitution's prohibition on cruel or unusual punishment.

### A. PRESERVATION AND STANDARD OF REVIEW

Jarrell did not challenge the constitutionality of SORA at sentencing, leaving this issue unpreserved. We review an unpreserved constitutional claim for plain error affecting a defendant's substantial rights. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). Under the plain-

error rule, Jarrell bears the burden to prove: 1) an error occurred, 2) the error was plain, i.e., clear or obvious, and 3) the plain error affected his substantial rights, meaning it affected the outcome of the proceedings. *Id*. at 763. If Jarrell satisfies those three requirements, reversal is warranted only when the plain error "resulted in the conviction of an actually innocent defendant" or "seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 763-764 (quotation marks, citation, and alteration omitted).

## B. ANALYSIS

A party challenging the constitutionality of a statute has the burden of proving its invalidity. *People v Sadows*, 283 Mich App 65, 67; 768 NW2d 93 (2009). Such a challenge "can be brought in one of two ways: by either a facial challenge or an as-applied challenge." *In re Forfeiture of 2000 GMC Denali & Contents*, 316 Mich App 562, 569; 892 NW2d 388 (2016). A facial challenge involves a claim that "there is no set of circumstances under which the enactment is constitutionally valid," *People v Wilder*, 307 Mich App 546, 556; 861 NW2d 645 (2014), while an as-applied challenge "considers the specific application of a facially valid law to individual facts," *Promote the Vote v Secretary of State*, 333 Mich App 93, 117; 958 NW2d 861 (2020) (quotation marks and citation omitted). Jarrell raises an as-applied challenge to SORA.[5] He contends that SORA's lifetime registration requirement violates article 1, § 16 of the Michigan Constitution, which prohibits "cruel or unusual punishment."

As a threshold matter, "the constitutional prohibition against cruel or unusual punishment requires that there first be a punishment imposed." *People v Lymon*, ___ Mich App ___, ___; ___ NW2d ___ (2022) (Docket No. 327355); slip op at 11. Our Supreme Court has held that registration under the 2011 SORA is a punishment, *Betts*, 507 Mich at 562, and we recently held that mandatory compliance with the 2021 SORA is a punishment, *Lymon*, ___ Mich App at ___; slip op at 18.

Neither opinion, however, answered whether mandatory lifetime registration under SORA necessarily constitutes cruel or unusual punishment. For instance, *Lymon* held only that SORA registration was "cruel or unusual punishment for a crime that lacks a sexual component and is not sexual in nature." *Id*. at 18. In that case, the defendant had been convicted of unlawful imprisonment of a minor and placed on the sex offender registry under SORA, but the crimes did not have any sexual component. *Id*. at 18-19. Here, of course, Jarrell's CSC-I conviction is sexual in nature, and thus *Lymon*'s limited holding does not apply. Therefore, we must next determine

---

[5] Jarrell's brief includes the subheading, "SORA as applied to Mr. Jarrell is cruel or unusual," and does not argue that SORA registration is categorically unconstitutional. At oral argument, however, defense counsel stated that Jarrell was pursuing a facial challenge to the constitutionality of SORA. Unable to reconcile these positions, we follow the arguments as raised in briefing, and therefore we treat Jarrell's argument as an as-applied challenge.

whether SORA registration, as applied to Jarrell's circumstances, constitutes cruel or unusual punishment.[6]

"To determine whether a punishment is cruel or unusual, courts assess whether it is 'unjustifiably disproportionate' to the offense committed by considering four factors: (1) the harshness of the penalty compared to the gravity of the offense, (2) the penalty imposed for the offense compared to penalties imposed for other offenses in Michigan, (3) the penalty imposed for the offense in Michigan compared to the penalty imposed for the same offense in other states, and (4) whether the penalty imposed advances the goal of rehabilitation." *Id*. at 18, quoting *People v Bullock*, 440 Mich 15, 30, 33-34; 485 NW2d 866 (1992).

Jarrell is considered a Tier III offender under SORA because of his CSC-I conviction. See MCL 28.722(v)(iv). Thus, Jarrell must register as a sex offender for life, MCL 28.725(13), meaning that he must continue to register as a sex offender even after his release from prison. "[R]egistration under SORA imposes affirmative obligations amounting to an onerous burden on registrants." *Lymon*, ___ Mich App at ___; slip op at 19. These obligations for a Tier III offender include reporting life changes such as a change in residence, employment, e-mail address, or telephone number, MCL 28.725(1)-(2), and reporting in person four times per year to verify residence, MCL 28.725a(3)(c). See also *Lymon*, ___ Mich App at ___; slip op at 19 (listing several SORA registration requirements). Certain biographical and personal information about Jarrell, such as his address, license plate number, physical description, and photograph, must also be made available on a public website. See MCL 28.728(2).

Beginning with the harshness of the penalty compared to the gravity of the offense, Jarrell was convicted of CSC-I because he sexually penetrated the victim without consent and under circumstances involving the commission of unlawful imprisonment. See MCL 750.520b(1)(c). There are few crimes considered as grave in our society as CSC-I. Reflecting the seriousness of these offenses, our Legislature provided that CSC-I is generally punishable "by imprisonment for life or for any term of years." MCL 750.520b(2)(a). The trial court sentenced Jarrell to 25 to 60 years' imprisonment for his CSC-I convictions. Jarrell contends that because SORA's registration requirements subject him to additional punishment beyond the term of his sentence, this penalty is disproportionate to his offense. But considering the gravity of the offense and the potential penalty that Jarrell faced, we do not believe that lifetime SORA registration is unduly harsh as applied to Jarrell's circumstances. The trial court found that Jarrell made credible threats of harm which led the victim to believe—among other things—that she owed Jarrell a debt, that she was being watched, and that Jarrell would physically harm or kill her or her daughter. Amid this ongoing restraint—reinforced by significant psychological pressure and the frequent display of weapons— Jarrell orally and vaginally penetrated the victim without her consent. Considering the heinous facts underlying Jarrell's convictions, and given that Jarrell faced a statutory maximum life sentence for his CSC-I convictions, we cannot conclude that a lifetime registration requirement for Tier III offenders like Jarrell is unjustifiably disproportionate to the offense.

---

[6] Jarrell does not challenge the constitutionality of the mandatory lifetime electronic monitoring requirement for his CSC-I convictions, see MCL 750.520n, which is separate from the requirements imposed by SORA.

Second, Jarrell's mandatory lifetime sex offender registration is not unduly harsh as compared to penalties imposed for other offenses in Michigan. Mandatory punishment provisions are not uncommon, particularly for CSC-I convictions. For instance, depending on the age of the offender and victim, a CSC-I conviction may involve a mandatory 25-year minimum sentence, MCL 750.520b(2)(b), or a mandatory life sentence, MCL 750.520b(2)(c). "Legislatively mandated sentences are presumptively proportional and presumptively valid," *People v Brown*, 294 Mich App 377, 390; 811 NW2d 531 (2011), and "a proportionate sentence is not cruel or unusual," *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). Jarrell has failed to overcome the presumption that mandatory lifetime sex offender registration is proportional as applied to his case, and he cannot show that such a penalty is disproportionately harsh compared to other penalties imposed in Michigan.

Third, comparing the penalty to that imposed by other states, mandatory lifetime sex offender registration is not unique to Michigan. Many states have a tiered system for sex offender registration, with lifetime registration reserved for the most heinous perpetrators of sexual assault.[7]

Finally, considering whether lifetime registration advances the goal of rehabilitation, we agree with Jarrell that his obligations under SORA will not assist his rehabilitation. See *Betts*, 507 Mich at 556, 560-562 (recognizing a "growing body of research" that "sex-offender registries have dubious efficacy in achieving their professed goals of decreasing recidivism"). But while lifetime registration under SORA does not advance the goal of rehabilitation, the other three factors strongly support that such a punishment is neither cruel nor unusual as applied to Jarrell's CSC-I convictions. Therefore, we conclude that SORA's lifetime registration requirement is not unjustifiably disproportionate under the circumstances of this case. Jarrell has not established plain constitutional error in his as-applied challenge that the requirements of SORA violate the Michigan Constitution's prohibition on cruel or unusual punishment.

## IV. STANDARD 4 BRIEF

In a Standard 4 brief,[8] Jarrell alleges there was a fraudulently obtained "adhesion contract" that was formed by the defense and the prosecution without his knowledge. Jarrell does not identify the alleged contract to which he believes he was subjected, nor does he describe the nature or terms of the alleged contract, or, for that matter, how he came to believe that any such contract existed. Even criminal defendants proceeding in propria persona must provide some kind of support for their claims. See *Estelle v Gamble*, 429 US 97, 106-108; 97 S Ct 285; 50 L Ed 2d 251 (1976). Because Jarrell has provided no factual basis for his argument, we are unable to comprehend it. Therefore, we consider the issue abandoned. See *People v McPherson*, 263 Mich

---

[7] See Collateral Consequences Resource Center, *50-State Comparison: Relief from Sex Offense Registration Obligations*, available at <https://ccresourcecenter.org/state-restoration-profiles/50-state-comparison-relief-from-sex-offender-registration-obligations/> (accessed November 10, 2022) (comparing sex offense registration requirements across the states).

[8] Under Administrative Order No. 2004-6, a "Standard 4 brief" refers to a pro se brief filed to raise additional claims on appeal against the advice of counsel. *People v Ryan*, 295 Mich App 388, 392 n 1; 819 NW2d 55 (2012).

App 124, 136; 687 NW2d 370 (2004) ("The failure to brief the merits of an allegation of error constitutes an abandonment of the issue.").

Jarrell subsequently supplemented his Standard 4 brief to raise various claims of ineffective assistance of counsel related to the actions of his trial counsel. The Michigan and United States Constitutions require that criminal defendants receive the assistance of counsel in their defense. Const 1963, art 1, § 20; US Const Am VI. When reviewing an ineffective assistance of counsel claim, Michigan courts apply the two-pronged test adopted by the United States Supreme Court in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *People v Pickens*, 446 Mich 298, 309, 338; 521 NW2d 797 (1994). Under this test, a defendant must establish (1) that "counsel's performance fell below an objective standard of reasonableness" and (2) that "but for counsel's deficient performance, a different result would have been reasonably probable." *People v Armstrong*, 490 Mich 281, 289-290; 806 NW2d 676 (2011), citing *Strickland*, 466 US at 687-688, 694-696.

Jarrell lists 21 factual allegations or occurrences that purportedly establish trial counsel's ineffectiveness. Jarrell provides no analysis, nor a single citation to relevant authorities, to support his criticisms of defense counsel's performance. He fails to explain how counsel's performance fell below an objective standard of reasonableness or how he was prejudiced by the alleged instances of ineffective assistance of counsel. We therefore likewise conclude that these ineffective assistance claims are abandoned. See *McPherson*, 263 Mich App at 136.

## V. CONCLUSION

Under MCL 750.349b, the knowing restraint element of unlawful imprisonment does not require evidence of physical force. Nonphysical force that involves a credible threat of harm can constitute restraint when it "forcibly restrict[s] a person's movements" or "forcibly confine[s] the person so as to interfere with that person's liberty without that person's consent or without lawful authority." MCL 750.349b(3)(a). The trial court did not err by concluding that psychological pressure and threats could constitute restraints for purposes of unlawful imprisonment, and there was sufficient evidence supporting Jarrell's unlawful imprisonment conviction on these facts. Further, mandatory lifetime sex offender registration does not constitute cruel or unusual punishment as applied to Jarrell's case. For these reasons, we affirm Jarrell's convictions and sentences.

/s/ Kristina Robinson Garrett
/s/ Brock A. Swartzle
/s/ Amy Ronayne Krause

-12-